OPINION OF THE COURT
Friedman, J.E
Plaintiffs allege that they were induced to sell out their indirect minority interest in an Ecuadorian mobile telephone company by misrepresentations made to them by defendants (the owner of the majority interest and its affiliates) concerning the value of the underlying enterprise. We hold that plaintiffs’ various causes of action for fraud and breach of contract are barred by the general release they granted defendants in connection with the sale of their interest, which release covered any and all claims, “whether past, present or future, actual or contingent,” arising from the parties’ association as co-investors in this enterprise.
Plaintiffs Centro Empresarial Cempresa S.A. and Conecel Holding Limited are British Virgin Islands entities that, as of 1999, held a combined majority interest in defendant Consorcio Ecuatoriano de Telecommunicaciones S.A. Conecel (Conecel), the Ecuadorian mobile telephone company. As alleged in the complaint, in 1999, plaintiffs were seeking an outside investor to infuse additional capital into Conecel. To that end, they approached defendant Carlos Slim Helú (Slim), the chairman of defendant Teléfonos de México, S.A. de C.V (Telmex), a Mexican telecommunications company with operations (through subsidiaries) throughout Latin America. Slim expressed interest in acquiring 100% of Conecel, but plaintiffs insisted on retaining a minority interest in the company and on participating in any “upside” that might result from a future public offering of its shares.
After several months of negotiation, the parties entered into a number of related agreements, dated as of March 8, 2000, under which Telmex invested $185 million in Conecel and acquired a 60% indirect interest in the company, with plaintiffs (together with a third investor not participating in this lawsuit) retaining *312 a combined 40% indirect interest. As a result of the transaction, the parties held their interests in Conecel through defendant Telmex Wireless Ecuador LLC (TWE), a newly formed Delaware limited liability company.[1] Telmex held its interest in TWE through a subsidiary, defendant Telmex Wireless LLC (Telmex LLC), which, under the TWE limited liability company agreement, was given the responsibility to “oversee [TWE’s] accounting, tax and recordkeeping matters.”[2]
One of the contracts made in connection with Telmex’s investment in Conecel was the Agreement Among Members, dated March 8, 2000. Section 3.09 of the Agreement Among Members provided that, in the event Telmex sought to consolidate its Latin American telecommunications interests into one entity “for purposes of selling the equity securities of such entity in international capital markets” (a transaction the complaint refers to as a “roll-up”), plaintiffs would have the right to “negotiate in good faith (for a period not to exceed 20 days)” to exchange their units in TWE for equity shares of the new entity “at a mutually satisfactory rate of exchange.”[3]
Another contract made in connection with the transaction was the Put Agreement, dated March 8, 2000, which granted plaintiffs the right to require Telmex LLC to purchase, at a preset price, up to 95% of plaintiffs’ TWE units in increments during three six-month windows of time over a period of 6½ years. The price set by the Put Agreement (referred to in the complaint as the “Floor Price”) was based on Conecel’s value at the end of 1999, at which time (plaintiffs allege) Ecuador’s economy was in crisis and, as a result, Conecel’s value was depressed. The Put Agreement entitled plaintiffs to “put” up to *313 50% of their TWE units to Telmex LLC during the 180 days following March 8, 2002; up to 75% of their units during the 180 days following March 8, 2004; and up to 95% of their units during the 180 days following March 8, 2006.
In September 2000, Telmex formed defendant América Móvil, S.A.B. de C.V (América Móvil), a spin-off company which became the holding company for a number of Telmex’s telecommunications interests, including TWE (and thus Conecel). The complaint alleges that plaintiffs did not learn of the formation of América Móvil until December 2000, when the latter filed a registration statement with the United States Securities and Exchange Commission setting forth the trading markets on which its shares were listed, including the New York Stock Exchange and Nasdaq. The complaint further alleges that “[t]he América Móvil spin-off constituted a roll-up as covered by Section 3.09 of the Agreement Among Members,” triggering plaintiffs’ right to a 20-day negotiation for an exchange, “at a mutually satisfactory rate,” of their TWE units for América Móvil shares.
The complaint alleges that, beginning in March 2001, plaintiffs sought to enter into negotiations with defendants concerning an exchange of their TWE units for América Móvil shares and, to that end, requested that defendants provide them with Conecel’s and TWE’s internal “financial information” and business plans. The complaint further alleges that defendants failed to provide plaintiffs with the requested information, in violation of various contractual obligations to do so, and instead consistently brushed off plaintiffs’ requests for information, failing to return phone calls and directing plaintiffs from one executive to another. Plaintiffs also allege that, to the extent defendants provided them with any information about the value of Conecel and TWE, such information, whether conveyed orally or in written documents (such as balance sheets), was to the effect that Conecel was “financially distressed with uncertain prospects,” consistent with the company’s public filings. Plaintiffs allege that the bleak picture of Conecel’s financial condition thus portrayed to them (and to investors generally through public filings) was materially false and misleading. In fact, plaintiffs allege, Conecel was performing much better than reflected in defendants’ oral and written representations and public filings.
It is further alleged that plaintiffs, having been led by defendants to believe that Conecel was in financial difficulty, disposed *314 of their interest in Conecel in two stages. First, in March 2002, plaintiffs exercised their right under the Put Agreement to sell 50% of their TWE units to Telmex LLC at the preset “Floor Price,” which amounted to $64 million. In this regard, plaintiffs allege:
“Deprived by [defendants of complete and accurate financial information regarding Conecel in public filings [szc], [plaintiffs] were deprived of having an informed negotiation for the exchange [pursuant to section 3.09 of the Agreement Among Members] and were wary of the threat that [defendants would never negotiate in good faith and would never distribute the Conecel profits through TWE LLC as agreed by them. Consequently, [plaintiffs] were left with no practical alternative but to dispose of the portion of their interest in . . . TWE LLC that could be sold through the exercise of the First Put [under the Put Agreement].”
The complaint alleges that defendants’ obfuscation and misrepresentation of Conecel’s true financial condition continued for more than a year after plaintiffs’ exercise of their first option under the Put Agreement. Ultimately, in 2003, Telmex LLC offered to purchase all of plaintiffs’ TWE units at the “Floor Price” set by the Put Agreement, but in advance of the schedule set by that agreement. Plaintiffs accepted the offer, allegedly “in reliance on [defendants’] misrepresentations,” and the parties entered into a Purchase Agreement, dated July 29, 2003, pursuant to which plaintiffs sold their remaining TWE units, to Telmex LLC at the “Floor Price,” which amounted to another $64 million. It is undisputed that the Purchase Agreement was the product of rigorous, arm’s length negotiations between sophisticated parties, all of whom were advised by their own expert legal counsel.
Pursuant to the Purchase Agreement, the parties executed and exchanged a broadly drafted mutual release (the 2003 release), under which, in pertinent part, plaintiffs
“fully release[d] [defendants] of and from all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands, liability [szc], whatsoever, in law or equity *315 whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members and/or arising out of, based upon, attributable to or resulting from the ownership of membership interests in [TWE] or having taken or failed to take any action in any capacity on behalf of [TWE] or in connection with the business of [TWE].”
The complaint further alleges that, years after the buyout of plaintiffs’ interest, defendants’ alleged dishonesty was exposed as a result of an audit of Conecel conducted by the Ecuadorian tax authority. The findings of the tax audit allegedly revealed that “the true financial results of Conecel in 2001-2003 were considerably better than represented by [defendants to [p]laintiffs when [defendants offered to purchase [plaintiffs’ Units [in TWE].” As a result, plaintiffs commenced this action for fraud and breach of contract in 2008. Plaintiffs allege that, had defendants honored their right to negotiate an exchange of their TWE units for América Móvil shares, plaintiffs would have owned América Móvil shares worth more than $1 billion as of May 30, 2008 (the date of the complaint). By contrast, plaintiffs complain, defendants induced them to sell their TWE units in the 2002 and 2003 transactions for aggregate consideration of less than $130 million.
Based on the allegations of the complaint itself, this action is barred in its entirety, as a matter of law, by the 2003 release that plaintiffs granted defendants in connection with the sale of all of their remaining interest in TWE to Telmex LLC for $64 million, years in advance of their right to require Telmex LLC to purchase nearly all of that interest under the Put Agreement. Indeed, plaintiffs do not deny that their claims fall squarely within the scope of the plain terms of the 2003 release which, to reiterate, extinguishes defendants’ liability in
“all manner of actions . . . whatsoever, in law or equity, whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members [of TWE] and/or arising out of, based upon, attributable to or resulting from the ownership of membership interests in [TWE] or having taken or failed to take any action in any capacity on behalf of [TWE] or in connection with the business of [TWE].”
Notwithstanding that the 2003 release, by its terms, encompasses any kind of claim arising from the parties’ holding of *316 interests in TWE, plaintiffs argue that the allegations of the complaint, if true, make out a case for voiding the 2003 release on the ground of fraudulent inducement. In this regard, plaintiffs point to their allegations that, during the period from 2001 through the buyout of their interest in TWE in 2003, defendants were (as plaintiffs claim) misrepresenting to them that Conecel (which was owned by TWE) was “financially distressed with uncertain prospects,” consistent with the company’s public filings. According to the complaint, defendants never corrected these alleged misrepresentations at any time before the execution of the 2003 release. As a result, plaintiffs allege, they were induced to sell their interest in TWE to defendants in July 2003 (forgoing the negotiated exchange to which they were entitled) and, as part of that transaction, to grant defendants the 2003 release. It is plaintiffs’ contention that these allegations, if proven at trial, would establish that the 2003 release was the product of fraudulent inducement and, as such, voidable.
In our view, plaintiffs have not alleged any basis for voiding the release they granted to defendants. As the Court of Appeals has explained:
“[A] release may [not] be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice” (.Mangini v McClurg, 24 NY2d 556, 563 [1969]).[4]
*317 In this case, plaintiffs seek to convert the 2003 release into a starting point for new (rather than renewed) litigation, essentially asking to be relieved of the release on the ground that they did not realize the true value of the claims they were giving up, namely, their claims for the value of their interests in TWE. In other words, as defendants point out, plaintiffs are arguing that a release may be invalidated by its own effectiveness. We find this contention to be self-refuting.
It is clear from the allegations of the complaint that the issue in contention between the parties when they negotiated the July 2003 sale of plaintiffs’ interests in TWE to defendants was the value of Conecel, TWE’s sole asset. The parties agreed on a purchase price of $64 million, which plaintiffs received immediately, thereby avoiding waiting years for the exercise dates of their second and third options under the Put Agreement (2004 and 2006, respectively). The parties further agreed that plaintiffs would grant defendants a broad release of any and all claims, “whether past, present or future, actual or contingent,” arising from “the ownership of membership interests in [TWE] or having taken or failed to take any action in any capacity on behalf of [TWE] or in connection with the business of [TWE].” On its face, this language clearly includes any claim possibly to be discovered in the future that defendants had misrepresented the value of Conecel (and, thus, of TWE), the issue at the heart of the entire deal.
Whether or not plaintiffs had reason to suspect that defendants were misrepresenting the value of Conecel in the negotiation of the 2003 transaction, they cannot reasonably contend that they did not intend to release possible fraud claims as to that matter of which they were unaware. Whatever subjective intent they may have harbored, the objective meaning of the release they signed was that any such fraud claims they might subsequently discover were being extinguished. A party cannot overturn the settlement of a dispute as to a particular matter (here, the value of Conecel) on the ground that “it reasonably relied on a representation by [its adversary], in . . . [the] settlement negotiations, as to that exact point” (Eastbrook Caribe, A.V.V. v Fresh Del Monte Produce, Inc., 11 AD3d 296, 297 [2004], *318 lv denied in part, dismissed in part 4 NY3d 844 [2005]).[5] In other words, “[wjhen a party releases a claim for fraud, it can later challenge that release for fraudulent inducement only by identifying a separate and distinct fraud from that contemplated by the agreement” (DIRECTV Group, Inc. v Darlene Invs., LLC, 2006 WL 2773024, *4, 2006 US Dist LEXIS 69129, *11 [SD NY 2006]). In this case, plaintiffs have not alleged that the 2003 release granted in connection with the buyout transaction was induced by a fraud as to any matter “separate and distinct” from the issue settled by that very transaction, namely, the value of Conecel.[6]
Contrary to plaintiffs’ contentions, a claim for fraud within the scope of a release can be released even if it is unknown to the releasor, and notwithstanding that the releasee did not make . full disclosure of its wrongdoing before the release was granted (see Bellefonte Re Ins. Co. v Argonaut Ins. Co., 757 F2d 523, 527-528 [2d Cir 1985]; Alleghany Corp. v Kirby, 333 F2d 327, 333 [2d Cir 1964], adhered to on reh 340 F2d 311 [1965, en banc], cert dismissed sub nom. Holt v Alleghany Corp., 384 US 28 [1966]; Consorcio Prodipe, S.A. de C.V. v Vinci, S.A., 544 F Supp 2d 178, 190-192 [SD NY 2008]). As stated in the last cited case, “[a] ‘general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud’ ” (id. at 191, quoting Sotheby’s, Inc. v Dumba, 1992 WL 27043, *7, 1992 US Dist LEXIS 965, *21 [SD NY 1992]).[7] Further, a release that, by its terms, extinguishes liability on any *319 and all claims arising in connection with specified matters is deemed to encompass claims of fraud relating to those matters, even if the release does not specifically refer to fraud and was not granted in settlement of an actually asserted fraud claim (see Consorcio, 544 F Supp 2d at 192 [where “language of remarkable breadth makes clear the parties’ intent to release all claims, including those of fraudulent inducement,” court held that “(e)ven if no semblance of fraud had come to light before the releases were executed, it is clear that the parties intended to settle fraud claims” (citations, internal quotation marks, ellipsis and brackets omitted)]).[8]
While Telmex LLC, as the holder of the majority interest in TWE (and, through TWE, Conecel) owed plaintiffs certain fiduciary duties, the foregoing principles apply (at least among sophisticated parties advised by counsel) even where the releasee is a fiduciary (see Alleghany Corp., 333 F2d at 328 [enforcing release granted to defendant Kirby by corporation of which he had been an “officer() and director()”]; Consorcio, 544 F Supp 2d at 191 [“ ‘the policy underlying Alleghany and Bellefonte applies with equal force to fiduciaries’ ” (brackets omitted)], quoting Tyson v Cayton, 784 F Supp 69, 75 [SD NY 1992] [enforcing boxer’s release of his former manager]; Gaetjens v Gaetjens, Berger & Wirth, 151 F Supp 701, 704 [SD NY 1957] [counterclaim against former corporate officer for conversion of corporate funds was barred by release, notwithstanding that corporation did not know of the conversion when release was signed]). If Telmex LLC’s fiduciary status alone sufficed to prevent it from obtaining the dismissal of this action based on the 2003 release, the implication would be that a fiduciary can never obtain a valid release without first making a full confession of its sins to the releasor, regardless of the releasor’s sophistication and the arm’s length nature of the negotiations from which the release emerged. This is not the law (see Alleghany Corp., 333 F2d at 333 [it was “no prerequisite” to the *320 effectiveness of a release of a fiduciary defendant that he “come forward and confess to all his wrongful acts” before the granting of the release]). Such a rule would, render useless and meaningless any release of a party that owed the releasor a fiduciary duty, thereby unjustifiably impinging on the freedom of commercial actors to order their own affairs by contract and, moreover, contravening the public policy favoring the settlement of business disputes. We are not aware of any precedent compelling us to accept such an absurd result.
Further, the allegations of the complaint make clear that plaintiffs entered into the 2003 transaction well aware that defendants had not given them access to the internal financial records of Conecel. If plaintiffs did not intend to release claims of fraud concerning the value of Conecel that they might discover in the future, they should have insisted on access to Conecel’s internal books and records (see DDJ Mgt., LLC v Rhone Group L.L.C., 60 AD3d 421, 424 [2009], lv granted 13 NY3d 710 [2009]) instead of relying on public filings and the limited documentation and oral representations defendants provided. If defendants would not provide access to the internal books and records voluntarily, plaintiffs could have sued for such access under the terms of their existing agreements with defendants.
More fundamentally, if plaintiffs did not wish to forgo suing on a fraud claim they might discover in the future, these sophisticated and well-counseled entities should have insisted that the release be conditioned on the truth of the financial information provided by defendants (whether directly or through public filings) on which plaintiffs were relying (see Graham Packaging Co., L.P. v Owens-Illinois, Inc., 67 AD3d 465 [2009]; Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 100-101 [2006], lv denied 8 NY3d 804 [2007]; Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc., 16 AD3d 352 [2005]; Rodas v Manitaras, 159 AD2d 341, 343 [1990]). In essence, by entering into the 2003 sale of their interests in reliance on defendants’ unverified representations concerning Conecel’s financial condition, without inserting into the agreement “a prophylactic provision ... to ensure against the possibility of misrepresentation” (Permasteelisa, 16 AD3d at 352), plaintiffs “may truly be said to have willingly assumed the business risk that the facts may not be as represented” (Rodas, 159 AD2d at 343). In this regard, we note that it is also clear from the complaint that, throughout the period in question (2001-2003), relations between the parties were adversarial, if not outright hostile, thereby negating as a matter of *321 law any inference that business entities as sophisticated as plaintiffs were relying on defendants for an objective assessment of the value of their investment (see Shea v Hambros PLC, 244 AD2d 39, 47 [1998]).
As previously stated, while it is true that defendants were fiduciaries insofar as they managed and held the majority interest in TWE, that does not permit plaintiffs to avoid the effect of the release they signed under the circumstances alleged in the complaint. This Court’s decision in Blue Chip Emerald v Allied Partners (299 AD2d 278 [2002]) is not to the contrary. In Blue Chip, the plaintiff was permitted to sue its former fiduciary in a joint venture for the ownership of a building, notwithstanding certain representations and disclaimers in the agreement for the fiduciary’s buyout of the plaintiffs interest, for the alleged concealment from the plaintiff, at the time it sold its interest, of the fiduciary’s oral agreement with a third party for the sale of the building, which transaction was consummated two weeks after the fiduciary bought out the plaintiff. It was critical to the result in Blue Chip that the plaintiff in that case did not have “at its disposal ready and efficient means” for ascertaining whether such an oral agreement (or an offer in the relevant price range) even existed (299 AD2d at 280). Here, by contrast, plaintiffs were well aware that Conecel did have a value, and nonetheless chose to cash out their interests without either insisting on verifying defendants’ representations as to that value or, on the other hand, conditioning the deal on the accuracy of the information they did receive. Indeed, as previously discussed, plaintiffs here were well aware that they were not in possession of all the information they believed they were entitled to when they sold their interests. Blue Chip is further distinguishable on the ground that it did not involve a formal general release but only contractual disclaimers of reliance.[9]
*322 For the foregoing reasons, this action is barred, in its entirety by the 2003 release. Since we reach this conclusion based on the allegations of the complaint itself and on the unambiguous language of the 2003 release, there is no need to give plaintiffs “their day in court,” as the dissent suggests we should. Assuming the truth of plaintiffs’ own allegations, they could not prevail at trial, as a matter of law. Given our conclusion that the 2003 release dictates the outcome of this appeal, we need not address defendants’ remaining arguments in favor of reversal. Although certain of the defendants have argued that they are not subject to personal jurisdiction in the New York courts, we are not asked to rule on the jurisdictional issue in the event we accept defendants’ primary argument that the complaint must be dismissed as against all of them based on the 2003 release.
Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered December 10, 2008, which denied defendants’ motion to dismiss the complaint, should be reversed, on the law, and the motion granted, with costs. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.
Catterson, J. (dissenting). I must respectfully dissent. The majority relies on the seminal case of Mangini v McClurg (24 NY2d 556 [1969]), but appears to miss the proposition for which it stands. In that case, the Court of Appeals held that while a release may not be treated lightly, “the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release.” (24 NY2d at 562.) It may be safely assumed that the plaintiffs were not contemplating the possibility of being defrauded out of hundreds of millions of dollars by signing the release. Further, the Court was clear that a release may be avoided “under circumstances and under rules which would render any other result a grave injustice.” (24 NY2d at 563.) In my opinion, allowing the defendants to invoke a release that was signed in consideration for a deal that rewarded only the defendants is the very essence of a grave injustice. More egregiously, it allows the defendants to flaunt their alleged contractual violations by arguing that any failure to negotiate in good faith or to provide key financial documents should have been recognized by the plaintiffs as an indication of fraud. *323 Incomprehensibly, the majority also adopts the defendants’ disingenuous argument that this Court would be invalidating a release because of “its own effectiveness” if it invalidated the release on the basis that the plaintiffs did not realize the true value of the claims they were giving up. It appears the majority has overlooked the well-established precept that releases “must be ‘knowingly and voluntarily entered into’ ” (Consorcio Prodipe S.A. de C.V. v Vinci, S.A., 544 F Supp 2d 178, 189 [SD NY 2008], quoting Skluth v United Merchants & Mfrs., 163 AD2d 104, 106 [1st Dept 1990] [emphasis added]) and propounds, instead, the view that an effective release is one in which the releasor is hoodwinked by the releasee.
In any event, the majority’s holding that the plaintiffs could have insisted on, or independently verified, defendants’ representations as to the value of the subject company ignores the fact that this is a motion to dismiss pursuant to CPLR 3211. This means that, at this stage of the pleadings: (1) all facts pleaded by the plaintiffs must be assumed to be true and the plaintiffs must be given the benefit of every reasonable inference, and (2) what the plaintiffs knew or should have known or should have investigated is an element of fraudulent inducement that cannot be determined on a motion to dismiss, but is subject to proof offered at trial. Ultimately, I disagree with the majority in its attempt to resolve the issue on its merits without giving the plaintiffs their day in court.
In this action for, inter alia, breach of contract and fraud, the defendants appeal the denial of their motion to dismiss primarily on the grounds that all of the plaintiffs’ causes of action are covered by a 2003 release, and all are time-barred by the applicable statutes of limitations. The plaintiffs, former owners of an Ecuadorian cell phone company, allege that they rejected Mexican billionaire Carlos Slim Helú’s (hereinafter referred to as Slim) initial offer to buy out their interest in the company, but that, nevertheless, within three years, América Móvil, a holding company of which Slim is chairman emeritus of the board, owned 100% of their interest. Why and how the plaintiffs came to divest themselves of their ownership interest lies at the crux of this action. The plaintiffs allege they were fraudulently induced to sell their ownership interest and to sign a release in favor of the defendants. Moreover, the plaintiffs claim that they did not discover the fraud until 2008 when a multi-year tax audit of the company by the Ecuadorian government revealed that publicly filed financial statements were false.
*324 The key issue on appeal is whether on the pleadings, the plaintiffs allege sufficient facts to controvert the release on the grounds of fraudulent inducement. Since on a motion pursuant to CPLR 3211, the court must accept as true the allegations of the complaint, and give the plaintiffs the benefit of any reasonable inference to be drawn from them (Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 414 [2001]; see also Littman v Magee, 54 AD3d 14 [1st Dept 2008]), and since the defendants owed the plaintiffs a fiduciary duty (54 AD3d at 15), I believe the motion court correctly found that the plaintiffs’ claims were not barred, as a matter of law, at this stage of the pleadings by the release they signed.
The plaintiffs are two Mexican companies, Centro Empresarial Cempresa S.A. and Conecel Holding Limited, which, before March 2000, jointly owned a controlling interest in Consorcio Ecuatoriano de Telecommunicaciones S.A. Conecel (hereinafter referred to as Conecel), an Ecuadorian cell phone company. The defendants are Conecel, América Móvil, S.A.B. de C.V (hereinafter referred to as América Móvil) and Teléfonos de México, S.A. de C.V (hereinafter referred to as Telmex), which are Mexican companies; Wireless Ecuador LLC, formerly known as Telmex Wireless Ecuador LLC (hereinafter referred to as TWE LLC) and AMX Ecuador LLC, formerly known as Telmex Wireless LLC (hereinafter referred to as Telmex LLC), which are Delaware LLCs; and two individual defendants, Slim, chairman emeritus of the boards of both Telmex and América Móvil, and Daniel Hajj Aboumrad (hereinafter referred to as Hajj), Slim’s son-in-law and the CEO of América Móvil.
The plaintiffs allege that in March 2000, they executed a series of agreements with Mexico’s leading telecommunications company Telmex and its wholly owned subsidiary, Telmex LLC. The agreements were executed in New York following discussions commenced in 1999 by Simon Parra, the plaintiffs’ representative, and Slim, owner and chairman of the board of Telmex.
At that time, the plaintiffs were seeking outside investors for the Ecuadorian wireless company in which they held a controlling interest. Slim stated that he was interested in buying 100% of Conecel, but Parra emphasized that the plaintiffs did not want to sell off the entire company. Slim then stated that he would invest in Conecel only if Telmex could hold a majority interest in the company. Slim told the plaintiffs that if Telmex or any of its affiliates acquired a majority interest in Conecel, there would be protections for the minority interest and a *325 potential upside in value for the minority such as through a stock exchange listing.
In January 2000, the parties signed a letter of intent, which provided that if there were a roll-up transaction—that is, if Telmex decided to consolidate its investments in various Latin American telecommunications companies so that those investments could be placed into the international markets—then the plaintiffs would have the right to exchange their shares in Conecel for shares of the new holding company.
In March 2000, the parties negotiated several agreements, which were all executed on March 8, 2000. The agreements were an Agreement Among Members, a Put Agreement, an LLC Agreement, a Purchase Agreement, and a Master Agreement. Pursuant to the latter, the plaintiffs contributed their Conecel capital stock to TWE LLC, a newly-formed Delaware limited liability company, in return for approximately 37% of the interest in TWE. Telmex contributed $150 million and paid $35 million to retire Conecel Holding Limited’s debt. In return, Telmex LLC received 60% of the interest in TWE.[1] Thus, pursuant to the Master Agreement, TWE became the sole shareholder of Conecel. Each party held its interest in TWE as a member of the company holding “Units.”
The LLC Agreement provided pursuant to section 7.4 that “Telmex LLC shall oversee the accounting, tax and record keeping matters of [TWE LLC]; provided that the Members shall be entitled to review any tax statements of [TWE LLC] prior to its filing. [TWE LLC] shall provide quarterly financial statements to all Members.”
Under the separate Put Agreement, the plaintiffs received the option to require Telmex LLC to purchase the following Units of TWE within any three 180-day periods: up to 50% of their Units during a 180-day period in 2002 (the first put right); an aggregate of 75% of their remaining Units during a six-month period in 2004 (the second put right); and up to an aggregate of 95% of their remaining Units during a six-month period in 2006 (the third put right). Further, the consideration to be paid— that is, the “floor price”—was fixed based on a value of Conecel at the end of 1999.
Entirely separate from the Put Agreement, the Agreement Among Members included two provisions regarding the potential roll-up transaction. First, section 3.06 provided:
*326 “Information. Prior to the occurrence of either an initial public offering of Conecel or the transaction described in Section 3.09 hereof, each of Telmex LLC, [TWE], and the Cempresa Parties will take all Necessary Action to provide the Cempresa Representative . . . with such financial, accounting and legal information with respect to Conecel and [TWE] as may reasonably be requested by the Cempresa Representative.”
Section 3.09 then provided, in pertinent part:
“Exchange of Units in Event of Consolidation of Telmex Business . . . [I]n the event that Telmex LLC or its Affiliates seeks to engage in a transaction to consolidate the investment of [Telmex Mexico] in the telecommunications industry in Central and South America, including [TWE] or Conecel, into a single entity for purposes of selling the equity securities of such entity in international capital markets, Telmex LLC and the Cempresa Parties shall negotiate in good faith (for a period not to exceed 20 days) to exchange Units for the equity securities of such entity at a mutually satisfactory rate of exchange.”
In September 2000, Telmex spun off América Móvil, a holding company for Telmex’s wireless business and for several indirectly owned international wireless businesses, including its partial ownership in TWE. The plaintiffs took the position that the formation of América Móvil constituted a transaction under section 3.09 of the Agreement Among Members, and therefore triggered their right to negotiate the exchange of their TWE Units for equity securities.
In March 2001, the plaintiffs’ representative met with defendant Hajj. According to the complaint, at that meeting, the plaintiffs’ representative told Hajj that the plaintiffs needed financial information about Conecel and its owner, TWE, in order to be able to negotiate a rate for the exchange. Despite the defendants’ contractual obligations, they refused to provide that information or to engage in good faith negotiations. When the plaintiffs tried to move negotiations forward by contacting various América Móvil personnel, such as the general counsel, those personnel failed to return their phone calls. Hence, the plaintiffs assert, they became “wary of the threat that [defendants would never negotiate in good faith.”
*327 The plaintiffs allege that the defendants caused Conecel to file false and misleading public financial information so as to make it appear that an exchange under section 3.09 of the Agreement Among Members would yield fewer América Móvil shares than was actually the case. Thus, in any informed and good faith negotiation as to an exchange of Units under section 3.09, the plaintiffs would have had a strong negotiating position because América Móvil’s securities had a depressed value on the stock exchanges, while the true value of Conecel would have increased the value of their TWE Units. Indeed, the plaintiffs allege that from the very beginning of the parties’ involvement, the defendants had had no intention of fulfilling the promises they had made to plaintiffs.
In 2002, the plaintiffs further allege that, as minority shareholders of a closed corporation, they realized they had “no practical alternative” but to dispose of the portion of the interest in TWE that could be sold through the exercise of the first put. Hence, the plaintiffs sold 50% of their Units in TWE, for the floor price, to Telmex LLC, receiving approximately $64 million.
From 2002 to 2003, after they exercised the first put, the plaintiffs continued to press the defendants (through Hajj) to negotiate as to the exchange of their remaining Units under section 3.09. According to the complaint, Hajj informed the plaintiffs that ConeceTs poor financial condition did not allow distribution of profits; they were supplied false information purporting to support the fact of ConeceTs financial troubles; and moreover neither Hajj nor anyone else acting for any defendant, including Telmex LLC, would discuss a range of prices for any exchange of Units.
In 2003, Telmex LLC offered to buy the plaintiffs’ remaining units at the floor price. Because the offer was made outside of the remaining put periods, it was contingent on the plaintiffs signing a release of claims against the defendants. The release purported to release the defendants from “all manner of actions . . . whatsoever, in law or equity, whether past, present or future, actual or contingent, arising under or in connection with the Agreement Among Members and/or arising out of, based upon, attributable to or resulting from” the ownership of TWE shares. In July 2003, the plaintiffs accepted the defendants’ offer and sold all their remaining TWE shares to Telmex LLC for another $64 million.
Subsequently, the Ecuadorian equivalent of the United States Internal Revenue Service audited Conecel for the tax years 2000 *328 through 2006. The plaintiffs allege that when the results of the audits were released, they realized that they had been defrauded because the defendants had concealed Conecel’s true financial condition. The plaintiffs allege the true value of Conecel would have provided them, with at least 7,000,000 American Depository Shares (ADSs) of América Móvil in a section 3.09 exchange of Units. The plaintiffs calculate that, as of the time the complaint was filed, the ADSs would have had a market value of $1 billion.
By complaint dated May 30, 2008, the plaintiffs commenced this action. In the complaint, the plaintiffs asserted 12 causes of action, for breach of contract,[2] breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, promissory fraud, fraud, conspiracy to defraud, fraudulent inducement, unjust enrichment, equitable estoppel, and for an accounting and declaratory judgment. The plaintiffs asserted jurisdiction pursuant to CPLR 302, the “transacting business” prong of New York’s long-arm statute.
By notice dated September 12, 2008, the defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (1), (5), (7) and (8) on the grounds of documentary evidence, release, failure to state a cause of action, and failure to assert cognizable damages. After oral argument, the court denied the motion. Ruling from the bench, the court noted, “the causes of action that are contained in the complaint are clear causes of action recognized in the State of New York, and they are not inartfully pled, they are pled rather straightforwardly.” The court also noted its disagreement with the defendants’ implied statement that “the releases, in effect, trump any fraudulent actions on our part.”
After hearing brief oral argument on the issue of jurisdiction, the court stated that it would allow discovery to proceed. For the reasons set forth below, I would modify the motion court’s ruling to the extent of dismissing the cause of action for unjust enrichment as against Telmex LLC, and by making the denial of so much of the motion as seeks to dismiss as against the individual defendants without prejudice, and otherwise affirm.
It is well established that “a valid release constitutes a complete bar to an action on a claim which is the subject of the *329 release.” (Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 98 [1st Dept 2006], lv denied 8 NY3d 804 [2007].) Nevertheless, it is equally well established that a release may be set aside on the grounds of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress. (Littman, 54 AD3d at 17; Global Mins., 35 AD3d at 98; see also Lobel v Maimonides Med. Ctr., 39 AD3d 275, 276 [1st Dept 2007].)
Further, a general release will not insulate a tortfeasor from allegations of breach of fiduciary duty, where it has not fully disclosed alleged wrongdoing. (Littman, 54 AD3d at 17; H.W. Collections v Kolber, 256 AD2d 240, 241 [1st Dept 1998].)
A plaintiff with a fraudulent inducement claim, however, must establish justifiable reliance on the misrepresentations or omissions at issue. (See Global Mins., 35 AD3d at 98.) Hence, if the plaintiff was aware of information that rendered his or her reliance unreasonable, or if he or she had enough information to create a duty to investigate further, the requisite reliance cannot be established. (Id. at 98-101; see also Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc., 16 AD3d 352, 352 [1st Dept 2005] [“plaintiff neglected to seek examination of the books and records of the company it was acquiring, relying on an unaudited financial statement that allegedly proved inaccurate”].)
In this case, the defendants argue that the plaintiffs’ own allegations demonstrate that the plaintiffs strongly suspected fraud as early as 2001 and “knew everything they needed to know” to file a lawsuit yet chose not to inquire further, and also chose to sign the release in return for valuable consideration. Specifically, the defendants argue that the right of plaintiffs pursuant to the Agreement Among Members was the right to negotiate in good faith, and that the plaintiffs knew that no such good faith negotiation had taken place as soon as América Móvil was spun off. The defendants point to the plaintiffs’ language that they were “wary of the threat that no good faith” negotiations would take place. Thus, the defendants argue that the plaintiffs had a duty to inquire further which they did not, or even to initiate a lawsuit based on the failure of the defendants to provide information as contractually required. The defendants further argue that the plaintiffs are similarly situated to the plaintiff in Global Minerals and must have known about the possibility of fraud as they demanded certain information but never received it.
In my opinion, the defendants’ argument is disingenuous, and insufficient to warrant imputing unjustifiable reliance, as a *330 matter of law, to the plaintiffs. Although the plaintiffs allege that the defendants’ representatives failed to return their phone calls and stalled negotiations by not turning over certain financial information, these allegations are not tantamount to admissions of knowledge of fraud. The plaintiffs clearly allege that some information was turned over at various times and it supported Hajj’s misrepresentations about Conecel, but the plaintiffs did not realize this information was false until after the government tax audit of the company. The defendants’ argument that the plaintiffs had ample means to investigate and had a contractual right to information for which they could have sued is meaningless. As the plaintiffs point out, no lawsuit or further inquiry could have produced accurate information for the plaintiffs. The alleged statements by Hajj that Conecel shares were worthless and that Conecel could make no distributions because it made no profits were supported by tax statements filed by Conecel that were also allegedly fraudulent and designed to gloss over the true worth of Conecel. The plaintiffs allege the same holds true for other financial statements that were turned over to the plaintiffs.
More significantly, the defendants owed a fiduciary duty to the plaintiffs who were minority shareholders in a limited liability corporation that defendants managed and in which they held a majority interest. (See e.g. Madison Hudson Assoc. LLC v Neumann, 44 AD3d 473, 484 [1st Dept 2007]; see also Metro Communication Corp. BVI v Advanced Mobilecomm Tech. Inc., 854 A2d 121, 152-153 [Del Ch 2004].) As a result, the plaintiffs were reasonably justified in their expectations that the defendants would disclose any information in their possession that might affect plaintiffs’ decision on their best course of action, especially as to signing the release that the defendants now argue bars this action. (See Blue Chip Emerald v Allied Partners, 299 AD2d 278, 279-280 [1st Dept 2002].)
In my opinion, the defendants’ reliance on Global Minerals is misplaced. That case is distinguishable in two important respects from this case: first, it was decided after discovery and a motion for summary judgment; and second, the Global Minerals plaintiff was provided with information strongly suggesting malfeasance by the defendants and was on notice of many of the acts alleged in the complaints when it issued its general release. (Global Mins., 35 AD3d at 97.)
Giving the plaintiffs “ ‘ “the benefit of every possible favorable inference” ’ ” (see Littman, 54 AD3d at 18, quoting AG *331 Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 591 [2005], quoting Leon v Martinez, 84 NY2d 83, 87 [1994]), their assertions are sufficient to support the claim that the release should be set aside on the ground of fraudulent inducement. I reject the majority’s attempt to distinguish Littman from the instant case. The majority does so on the basis that the plaintiff in Littman was told that no further documentation bearing on the valuation of the enterprise existed, thus exonerating him from the need to investigate further whereas here the plaintiffs were not so told. I fail to see how being told that no documentation exists provides a better basis for exoneration than receipt of publicly filed documents. In the instant case, whatever message was being conveyed by the defendants’ stonewalling, it was not incumbent on the plaintiffs to suspect that the defendants were defrauding a governmental agency by publicly filing false information.
I further reject the defendants’ argument that the plaintiffs’ challenge of the release for fraudulent inducement cannot stand because it does not identify a separate and distinct fraud from that contemplated by the agreement. The defendants rely on Alleghany Corp. v Kirby (333 F2d 327 [2d Cir 1964], adhered to on reh 340 F2d 311 [1965, en banc], cert dismissed sub nom. Holt v Alleghany Corp., 384 US 28 [1966]) and Eastbrook Caribe, A.V.V. v Fresh Del Monte Produce, Inc. (11 AD3d 296 [1st Dept 2004], lv denied in part and dismissed in part 4 NY3d 844 [2005]) on this issue but that reliance is misplaced. In both cases, allegations of fraud had been made in prior lawsuits. Here, the signing of the release was not preceded by the plaintiffs’ claims of fraud or any claims whatsoever, nor in response to any lawsuits. The defendants demanded the release in consideration for their spontaneous offer to accelerate the buyout of the balance of the plaintiffs’ interest in Conecel. Based on the plaintiffs’ allegations, at that time they had as little idea of the fraud being perpetrated as they did of the value of their Conecel holding. In any event, one of the cases that the majority relies on (Consorcio Prodipe, S.A. de C.V. v Vinci, S.A., 544 F Supp 2d 178 [2008], supra) specifically explains that a party challenging a release for fraudulent inducement must point to a separate and distinct fraud only where a party has granted a release for fraud. In the instant case, the release refers to general claims; fraud is not mentioned or contemplated in the release, and thus it is not necessary to point to a separate or distinct fraud.
*332 I would also find that the plaintiffs’ claims of fraud, conspiracy to defraud and fraudulent inducement are properly pleaded and are not duplicative of the breach of contract action. First, the breach of contract action is asserted only against Telmex LLC and TWE LLC in the first cause of action, and solely against Telmex LLC in the second cause of action. The fraud claims are asserted against all the defendants, not just the parties to the agreements at issue. Second, the defendants err in arguing that the plaintiffs have but a single cause of action which is their claim of an alleged violation of section 3.09 of the Agreement Among Members, the failure of the defendants to negotiate an exchange of Units.
It is well settled that “[a] fraud-based cause of action may he . . . where the plaintiff pleads a breach of a duty separate from a breach of the contract.” (Mañas v VMS Assoc., LLC, 53 AD3d 451, 453 [1st Dept 2008]; First Bank of Ams. v Motor Car Funding, 257 AD2d 287, 291 [1st Dept 1999].) The distinguishing test for determining whether a claim is actionable as a breach of contract only or also as a tort was set down long ago. (See Rich v New York Cent. & Hudson Riv. R.R. Co., 87 NY 382, 390-391 [1882].) The Rich Court found that, if there is a relationship between the parties giving rise to a distinct legal duty outside of the contract that is breached, neglect of that duty may constitute a tort. (Id.) “ ‘Where the defendant has done something more than remain inactive and is to be charged with a “misfeasance” the possibility of recovery in tort is considerably increased.’ ” (Albemarle Theatre v Bayberry Realty Corp., 27 AD2d 172, 175 [1st Dept 1967], quoting Prosser, Torts, at 637-638 [3d ed].) In the latter case, the Court found both breach of contract and fraud, determining that the defendants “not only failed to operate ... responsibly pursuant to the contract, but affirmatively, intentionally and wilfully set out ... to destroy the value and utility of the [subject facility].” (Albemarle Theatre, 27 AD2d at 174.)
It could be said that, likewise in this case, based on the plaintiffs’ allegations, the defendants not only failed to engage in good faith negotiations pursuant to their contractual obligation, but generated false, fraudulent financial statements, and that such misfeasance was designed to lead plaintiffs to forgo their right to negotiate for any exchange of shares. Assuming the truth of the plaintiffs’ allegations that as a result of the fraudulent statements they chose to forgo their right to negotiate an exchange pursuant to section 3.09 of the Agreement *333 Among Members, the defendants’ actions would be entirely collateral to their failure to perform under the agreement.
Indeed, based on the allegations of the plaintiffs, the observation of the Rich Court in that case could be aptly duplicated verbatim as follows:
“[A] breach of contract may be so intended and planned; so purposely fitted to time, and circumstances and conditions; so inwoven into a scheme of oppression and fraud ... as to cease to be a mere breach of contract, and become, in its association with the attendant circumstances, a tortious and wrongful act or omission.” (Rich, 87 NY at 398.)
Similarly, it is my view that, at this stage of the litigation, the fifth cause of action for promissory fraud is also adequately pleaded. The plaintiffs allege specifically what they must to adequately differentiate this claim from the one for breach of contract: that they were induced to enter into an agreement based on the defendants’ promises regarding potential benefits to the minority stockholders. Indeed, the plaintiffs allege that when Parra approached Slim and Telmex for a potential investment in Conecel, Parra rejected Slim’s proposal wherein Telmex would own 100% of Conecel, stating that plaintiffs did not, in fact, want to sell off 100% of Conecel. Therefore, according to a fair reading of the complaint, the plaintiffs entered into negotiations with the defendants only after Slim told the plaintiffs that he would settle for becoming a majority shareholder and that there would be protections for the minority interest and “potential upside” for the minority, such as a stock exchange listing. Giving the plaintiffs the benefit of any reasonable inference to be drawn from the allegations in the complaint, in my opinion they have adequately pleaded the fifth cause of action.
I further believe that the motion court properly denied dismissal of the cause of action for breach of fiduciary duty alleged against Telmex LLC. Generally, a cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand. (Granirer v Bakery, Inc., 54 AD3d 269, 272 [1st Dept 2008]; William Kaufman Org. v Graham & James, 269 AD2d 171, 173 [1st Dept 2000].) But “the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract but which is independent of the contract itself.” (Mandelblatt v Devon Stores, 132 AD2d 162, 167-168 [1st Dept 1987].) In this case, the relationship between *334 the parties was not established solely by the Agreement Among Members or the LLC Agreement of which sections 3.06, 3.09 and 7.4, respectively, were allegedly breached. The fiduciary relationship between Telmex and Cempresa was established by the Master Agreement pursuant to which TWE LLC became the sole shareholder of Conecel shares and by which Telmex LLC held a 60% majority interest while the plaintiffs became minority shareholders. Thus the defendants not only had a contractual obligation to provide information that was reasonably requested, but specifically had an obligation imposed by the fiduciary relationship to share any and all financial information that would impact the plaintiffs’ decision making in any negotiations for the exchange of shares.
I also find that the plaintiffs’ cause of action seeking recovery against defendants for their breach of the implied covenant of good faith and fair dealing is equally well pleaded. Since the breach of contract claims are pleaded only against Telmex LLC and TWE, this claim cannot be said to be “duplicative” as against the other defendants. What is more, at this stage of the litigation, the plaintiffs are permitted to plead in the alternative. (CPLR 3014; see Citi Mgt. Group, Ltd. v Highbridge House Ogden, LLC, 45 AD3d 487 [1st Dept 2007].) What plaintiffs essentially argue here, even aside from the breach of contract itself, is that the defendants acted in a manner that, although not expressly forbidden by any contractual provision, deprived the plaintiffs of the right to receive the benefits under the various agreements. (Jaffe v Paramount Communications, 222 AD2d 17, 22-23 [1st Dept 1996]; cf. Pier 59 Studios L.P. v Chelsea Piers L.P., 27 AD3d 217 [1st Dept 2006] [implied covenant claim dismissed after discovery and summary judgment motion].)
Finally, on the plaintiffs’ unjust enrichment cause of action, again I note that the claims for breach of contract are pleaded only against Telmex LLC and TWE, and thus, the claim of unjust enrichment cannot be said to be “duplicative” as against the other defendants named in the ninth cause of action— namely, América Móvil, Telmex Mexico, Slim, and Hajj. However, with respect to Telmex LLC, the plaintiffs plead no facts in their unjust enrichment claim separate from the general breach of contract claim. This is not a case where, for example, a plaintiff may be permitted to plead in the alternative because there is a bona fide disagreement as to whether a contract actually existed. (See e.g. Foster v Kovner, 44 AD3d 23, 29 [1st Dept 2007], citing Zuccarini v Ziff-Davis Media, 306 *335 AD2d 404 [2d Dept 2003].) Thus, in my opinion, the unjust enrichment claim should have been dismissed as against Telmex LLC, as it is duplicative of the breach of contract claim against that defendant.
I am not persuaded by the defendants’ argument that the fraud claims are not viable because the plaintiffs do not seek damages that would not be recoverable under a contract measure of damages. In addition to compensatory damages, in the fraud causes of action the plaintiffs ask for punitive damages, which should be considered in this case. Punitive damages may be recovered where the defendant has committed a gross, wanton, or willful fraud or other morally culpable conduct in a sufficiently high degree. (See Giblin v Murphy, 73 NY2d 769, 772 [1988].) Thus, the claim for punitive damages may well be viable. (See Lawlor v Engley, 166 AD2d 799 [3d Dept 1990] [demand for punitive damages properly asserted without allegation that fraud aimed at public generally].) However, discovery would be necessary to make that determination.
I also reject the defendants’ claims that plaintiffs’ breach of contract claims, including the claim for breach of the implied covenant of good faith and fair dealing, are time-barred because the six-year statute of limitations has passed. First, equitable estoppel will preclude a defendant from using the statute of limitations as a defense where a plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant. (Zumpano v Quinn, 6 NY3d 666, 673 [2006]; General Stencils v Chiappa, 18 NY2d 125, 128 [1966].) Although the plaintiffs have not established, on this record, their entitlement to equitable estoppel, I find that they have demonstrated a reasonable basis to believe that with additional discovery they may be able to develop facts sufficient to sustain their claim. (See Century Fed. Sav. & Loan Assn. of Long Is. v Net Realty Holding Trust, 87 AD2d 858 [2d Dept 1982] [“the issue of whether (a) defendant should be equitably estopped from asserting the Statute of Limitations as an affirmative defense to (a) plaintiffs complaint is not a question of law, but rather a question of fact”].)
In any event, in my view the statute of limitations does not necessarily act to bar the plaintiffs’ action. The claim of breach of contract as to section 3.09 of the Agreement Among Members did not accrue until all possibility of negotiation for the exchange of shares was foreclosed permanently by the sale of *336 the remaining shares in 2003.[3] Until that point in 2003, the parties could have conducted good faith negotiations as to the shares remaining in the plaintiffs’ possession.
As to the provision of section 7.4 of the LLC Agreement that pertains to the provision of quarterly tax statements, the statute of limitations started running the first quarter in which the plaintiffs were entitled to tax statements, that is, upon the execution of the agreements in 2000. An action for the failure to provide tax statements in the latter years up until the sale of all remaining units would not be time-barred, however. It is impossible to ascertain on the basis of the record, however, whether the plaintiffs’ cause of action is based on the defendants’ refusal to provide quarterly tax returns or whether it is based on the allegation that the financial statements provided were simply false. Hence, in my view, discovery would be required to determine whether that cause of action is time-barred and/or as of which year it is time-barred.
The statute of limitations for fraud claims is the greater of six years from the time of the fraud itself, or within two years of discovery of the fraud, or within two years of the time that a reasonable person should have discovered the fraud. (CPLR 213 [8].) The defendants make the same arguments here as they did for dismissal of the fraudulent inducement claim. In other words, that the plaintiffs were on notice of the possibility of fraud virtually from the beginning of the association when the defendants repeatedly refused to provide the critical financial data plaintiffs knew they possessed. As I have already observed, based on the plaintiffs’ allegations, they were not on notice of any fraud until the Ecuadorian government concluded its investigation and found that Conecel had filed false tax statements. Hence, I would find the plaintiffs’' fraud claims are timely, in particular because they could not have had the facts with which to allege fraud with the requisite particularity before the Ecuadorian investigation was completed.
Finally, as the defendants acknowledge, Wireless Ecuador LLC, formerly known as Telmex Wireless Ecuador LLC, and Telmex LLC consented to the New York courts’ exercise of personal jurisdiction of them by signing the parties’ Agreement Among Members or LLC Agreement, which contain New York *337 forum selection clauses. I find that Teléfonos de México, S.A. de C.V and Consorcio Ecuatoriano de Telecommunicaciones S.A. Conecel also consented, by signing the Master Agreement which conditioned their obligations upon their execution and delivery of the Agreement Among Members. América Móvil, S.A.B. de C.V is subject to the courts’ long-arm jurisdiction based on the listing and sale of its securities on the New York Stock Exchange (CPLR 302 [a] [1]; see e.g. Schottenstein v Schottenstein, 2004 WL 2534155, *9, 2004 US Dist LEXIS 22648, *46 [SD NY 2004].)
As to the individual defendants, Slim and Hajj, allegations through affidavits that they conducted numerous telephone conversations with representatives of the corporate defendants in New York, and directed the negotiations of the agreements, in my opinion, constitute a “sufficient start” to warrant further discovery as to whether the individual defendants inserted themselves in a meaningful way into business transactions in New York, thereby submitting to the New York courts’ jurisdiction. (See Peterson v Spartan Indus., 33 NY2d 463, 467 [1974]; Deutsche Bank Sec., Inc. v Montana Bd. of Invs., 21 AD3d 90, 93-94 [1st Dept 2005], affd 7 NY3d 65 [2006], cert denied 549 US 1095 [2006].)
Renwick and Freedman, JJ., concur with Friedman, J.P; Sweeny and Catterson, JJ., dissent in a separate opinion by Catterson, J.
Order, Supreme Court, New York County, entered December 10, 2008, reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

. TWE is now known as Wireless Ecuador LLC.

. Telmex LLC is now known as AMX Ecuador LLC.

. In pertinent part, section 3.09 of the Agreement Among Members provides:
“SECTION 3.09. Exchange of Units in Event of Consolidation of Telmex Business. For so long as the Adjusted Ownership Percentage of [plaintiffs] is (in the aggregate) equal to or greater than 5%, in the event that Telmex LLC or its Affiliates seeks to engage in a transaction to consolidate the investments of [Telmex] in the telecommunications industry in Central and South America, including [TWE] or Conecel, into a single entity for purposes of selling the equity securities of such entity in international capital markets, Telmex LLC and [plaintiffs] shall negotiate in good faith (for a period not to exceed 20 days) to exchange Units for the equity securities of such entity at a mutually satisfactory rate of exchange.”

. The dissent seizes on the statement in Mangini (which involved a personal injury claim on behalf of a minor) that there are cases in which it is appropriate to allow a party to “avoid[ ] [a release] with respect to uncontemplated transactions despite the generality of the language in the release” (24 NY2d at 562). This observation in no way supports the dissent’s position here, since plaintiffs’ present claims do not arise from any transaction that was “uncontemplated” by the parties when the 2003 release was granted. To reiterate, that release extinguished all claims arising from defendants’ conduct in connection with “the Agreement Among Members [of TWE] and/or . . . the ownership of membership interests in [TWE] or having taken or failed to take any action in any capacity on behalf of [TWE] or in connection with the business of [TWE]”—precisely the matters placed at issue by plaintiffs’ complaint. Moreover, nothing in Mangini supports the dissent’s apparent view that, in a commercial context, a party should not be held to a release if the claims it released later turn out to have been worth significantly more than it contemplated when the release was granted. While there are undoubtedly cases in which giving effect to a release would result in such “grave injustice” *317 (id. at 563) that it should not be enforced, this case—in which the releasors were highly sophisticated and well-counseled business organizations that granted the release as part of a deal in which they were paid $64 million and made a handsome profit—does not fall in that category, as discussed below.

. The dissent seeks to distinguish Eastbrook on the ground that the settlement at issue therein resolved a prior lawsuit in which fraud was alleged. Nothing in the decision, however, indicates that it was the pendency of fraud claims in the prior litigation that mandated the rejection of the plaintiffs attempt to invalidate the settlement on grounds of fraudulent inducement. Rather, it was the subject matter of the settled dispute that negated the plaintiffs claim that the settlement had been fraudulently induced by a misrepresentation as to that very matter.

. Plaintiffs attempt to distinguish between defendants’ alleged fraud through 2002 (when plaintiffs were prevented from exchanging their TWE units for América Móvil shares) and the alleged fraudulent inducement of the 2003 buyout transaction (when plaintiffs were induced to dispose of their interest altogether) based on the change in defendants’ objective. This argument is unavailing; in both cases, precisely the same factual matter (the true value of Conecel) was being misrepresented.

. We reject plaintiffs’ argument that a release, no matter how broad, does not encompass unknown claims unless it specifically recites that it covers claims “known and unknown.” As a federal appellate court has stated: “When a release provides that ‘any and all claims,’ ‘past, present, or future’ are to be extinguished, a court is required to enforce its provisions both as to known *319 and unknown claims” (Ingram Corp. v J. Ray McDermott & Co., Inc., 698 F2d 1295, 1312 [5th Cir 1983]).

. Contrary to the dissent’s implication, the court in Consorcio expressly rejected the argument that the fraud claims in that case were not barred by the plaintiffs’ release of the defendants because “no release at issue here was born from the settlement of a fraud claim” (id. at 191). Notwithstanding that the release at issue had not been granted in settlement of a previously asserted fraud claim and did not even expressly refer to fraud, the court held that “[t]he broad releasing language encompasses a fraudulent inducement claim because the claim relates to the Project” referenced by the release (id. at 192).

. Also distinguishable from the instant case is this Court’s decision in Littman v Magee (54 AD3d 14 [2008]), in which a general release in the agreement for the sale of the plaintiffs interest in a closely-held business was held not to bar a fraud action against a former fiduciary at the pleading stage because the complaint was deemed to allege that the defendant fiduciary had told the plaintiff that no further documentation bearing on the valuation of the enterprise existed, thereby exonerating the plaintiff from the need to investigate further (54 AD3d at 19). Here, plaintiffs do not allege that defendants told them that no information about Conecel’s financial condition beyond the minimal amount that had been shared with plaintiffs was in existence. In addition, the Littman plaintiff alleged that he was induced to sell out in part by a “threat [ ] that if [he] did not agree to the proposed sale, approximately *322 $1 million in income would be allocated to him for the year 2004, while no distribution would be made to him to cover the taxes resulting from that allocation” (id. at 16). No such threat or duress is alleged here.

. A third company, MasTec Ecuador, which is not a party to this action, held approximately three percent of the interest in TWE.

. The complaint contains two causes of action for breach of contract. The first is against Telmex LLC and TWE for breach of the LLC Agreement, specifically for breach of the previously mentioned section 7.4; the second is against Telmex LLC for breach of section 3.09 of the Agreement Among Members.

. The defendants’ argument that the claim accrued within 20 days of the América Móvil spin-off is not persuasive. The plain meaning of the provision indicates instead that any negotiations should be completed within 20 days. Here, negotiations had not commenced.