[824 NYS2d 210]

GLOBAL MINERALS AND METALS CORP., Appellant, v JAMES W. HOLME et al., Respondents.

First Department, October 3, 2006

### APPEARANCES OF COUNSEL

*Arnold & Porter LLP*, New York City (*H. Peter Haveles, J.* of counsel), for appellant.

*Seidman & Seidman, P.C.*, New York City (*Irving P. Seidman* of counsel), for James W. Holme and another, respondents.

*Graubard Miller*, New York City (*Steven Mallis* and *Edward H. Pomeranz* of counsel), for Ana Maria Holme, respondent.

### OPINION OF THE COURT

CATTERSON, J.

In this action, plaintiff Global Minerals and Metals Corp., a closely held corporation, alleges it was fraudulently induced by one of its four shareholders into signing a general release and severance agreement worth $15 million. For the reasons set forth below, we affirm the order of the motion court granting the defendants' motion for summary judgment and dismissing the complaint on the grounds that the plaintiff's reliance on the alleged misrepresentations was unreasonable, and the plaintiff failed to fulfill its duty to investigate.

Codefendant James Holme was one of four equal shareholders investing $250,000 in Global Minerals and Metals Corp. (hereinafter referred to as Global), a corporation established in January 1994. Global engaged in commodities trading of nonferrous metals. Codefendant Ana Maria Holme is Holme's wife, and codefendant H & H Metals Corp. (hereinafter referred to as H & H) is a corporation established by the Holmes while James Holme was a director and officer of Global.

Pursuant to the provisions of Global's Master Shareholders Agreement (hereinafter referred to as the shareholder agreement), upon a shareholder's resignation, Global or any existing shareholder would buy the shares of the resigning shareholder based on the book value "less a haircut." However, if a shareholder was found to be working against the best interests of Global, his shares would be purchased at the original cost plus interest of 10%.

The bulk of Global's business involved copper cathode trading with Sumitomo Corporation. In the beginning of 1995 those dealings with Sumitomo became the focus of criminal and regulatory investigations. In the spring of 1995, Holme

expressed an interest in leaving Global and starting a competing business.

After Holme made certain disclosures to a Sumitomo employee about their companies' trading, David Campbell, Global's president, authored a fax transmission wherein he stated that Holme "must leave Global ASAP. . . in a manner that he becomes neutralized and unable to open his big/dangerous mouth." Furthermore, Campbell stated that the other shareholders had suggested "immediate dismissal/legal action/a bullet(!)" for Holme.

Thereafter, Holme and Campbell started on-again, off-again negotiations regarding his departure. Global stopped providing Holme with certain financial information regarding its operations, claiming that the reason was because Holme was about to start a competing business.

On October 9, 1995, when Global's office was closed for a holiday, Holme copied documents, financial statements and other materials belonging to Global. Campbell acknowledged that Global knew that Holme had removed documents Global considered confidential.

On October 16, 1995, Holme resigned as an officer and director of Global. Campbell accepted and sent Holme a replacement letter of resignation on the following day. On October 18, Holme withdrew his resignation and formed H & H, of which he is currently the president and sole shareholder.

At the beginning of January 1996, Global discharged Holme as a Global director and officer, respectively. Unaware of the discharge, on January 31, 1996, Holme submitted a letter of resignation as director and officer, effective that day. Severance negotiations continued while Holme remained a shareholder until January 17, 1997.

On December 12, 1996, Holme's attorney Thomas Mohen advised Global's attorney Robert Pelz that Holme had loaned approximately $1,500,000 to Gerald Locker, the principal and CEO of Wessex Minerals & Metals Ltd. (hereinafter referred to as Wessex). At the time, Wessex was primarily a competing London-based commodities merchant, but was joint-venturing with Global in a transaction known as the "Bulgarian contract." Global investigated public records in London, and at the end of December 1996 discovered that 40% of Wessex's shares had been registered in Mrs. Holme's maiden name.

On January 8, 1997, Global's attorney Pelz wrote that Global had no role in Mr. Holme's private transactions with Wessex

and, indeed, was not aware of them, although they may well have occurred while he was an officer and director of Global.

By letter dated January 10, 1997, Holme's attorney assured Global that the 40% stockholding was given to Holme's wife as security for the arm's length loan made to Locker. Mohen also enclosed (1) a letter from Holme's attorney to Locker stating that Holme loaned Locker $1.5 million secured by 40% shares held by Mrs. Holme and demanding payment; (2) the response from Locker's attorney, Eversheds, indicating that while Locker did not admit that the transaction was a loan, he was willing to accept that interpretation for settlement purposes; and (3) a letter from Locker's attorney challenging the claim that the transaction was a loan and stating that Locker had documentation to fully substantiate Locker's position.

In the same letter, Holme's attorney also stated that Holme had formed a Wessex Minerals and Metals Corp. (hereinafter referred to as WMMC) solely for the purpose of holding the Bulgarian contract upon its anticipated assignment to him.

Thereafter, Global and Holme reached a settlement. On January 17, 1997, a series of settlement documents were signed between the parties terminating Holme's interest in Global and resolving all disputes between them.

The settlement documents included a "General Release" signed by Global in favor of Holme, which stated that Global "releases and discharges Holme" of all breaches of fiduciary duty he might have committed prior to its date, whether known or unknown.

The settlement documents also included a Confidentiality Agreement, which broadly defined the term "Confidential Information" to include "any information . . . with respect to the business or affairs of the Company." The Confidentiality Agreement precluded Holme from disclosing confidential information to any person or entity, without Global's prior written consent, for two years. However, the Confidentiality Agreement expressly permitted Holme to compete with Global and to use confidential information to do so.

The settlement documents also included a Severance Agreement, which required Global to pay Holme $4.5 million in three equal installments of $1.5 million. The second and third installments were due on January 17, 1998 and January 17, 1999, respectively, and remain unpaid. The Severance Agreement also expressly permitted Holme to directly compete with Global.

The settlement documents further included a Stock Purchase Agreement, pursuant to which Global paid Holme $4 million for his stock interest in Global, a letter agreement for $2 million payable to Holme comprising Holme's claim to a share of Global's profits, and a bonus agreement entitling Holme to $4.5 million.

Thereafter, in a letter to Holme, dated January 14, 1998, Global alleged that he had breached his fiduciary duties to Global by "lending to, or investing in, its competitor, Wessex."

In November 2000, after the confidentiality period expired, Global commenced this action against Holme, Mrs. Holme and H & H, asserting six causes of action for: (1) breach of fiduciary duty against all defendants; (2) fraudulent inducement against Holme; (3) specific performance against Holme; (4) breach of contract against Holme; (5) reformation; and (6) rescission.

Global claims that it was fraudulently induced to enter the agreements including the release because Holme misrepresented and concealed his breaches of fiduciary duty while he was employed by Global. Global specifically pointed to his failure to disclose his Wessex stock purchase, as well as H & H's involvement in a contract, originally brokered by Global between Alusaf and GM (hereinafter referred to as the Alusaf contract), prior to Holme's resignation on January 31, 1996.

Global maintains that had it been aware of these breaches, rather than buying out Holme pursuant to the shareholder agreement provision that netted him $15 million, it would have bought out Holme for approximately $325,000; viz. the original investment plus 10% interest. Global claimed that Mrs. Holme and H & H aided and abetted Holme's breach of fiduciary duty.

The defendants moved for summary judgment, arguing that Global's causes of action were barred by the General Release executed on January 17, 1997. Holme also asserted a counterclaim for $3 million representing severance payments due January 17, 1998 and January 18, 1999, respectively, which remained unpaid.

The motion court granted summary judgment in favor of the defendants and dismissed the complaint, finding that Global did not show that it reasonably relied on a known false representation because it was on notice of many of the acts alleged in the complaints at the time Global issued the general release. The motion court further found that Global failed to fulfill its duty to investigate. It also rejected Global's CPLR 3212 (f) discovery

request, stating that "plaintiff fails to identify an essential fact which is presently unavailable to Global." We agree.

It is well established that a valid release constitutes a complete bar to an action on a claim which is the subject of the release. (*See Hack v United Capital Corp.*, 247 AD2d 300, 301 [1st Dept 1998].) However, a release may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress. (*Id.*, citing *Mergler v Crystal Props. Assoc.*, 179 AD2d 177 [1st Dept 1992]; *see also Skluth v United Merchants & Mfrs.*, 163 AD2d 104 [1st Dept 1990].)

In order to set aside a release on such grounds, a plaintiff must establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury. (*Pope v Saget*, 29 AD3d 437, 441 [1st Dept 2006], citing *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403, 406-407 [1958].) Absent any of the elements, plaintiff does not have a prima facie case.

In this case, Global claims that Holme concealed his alleged breaches of fiduciary duty, namely the alleged ownership of Wessex stock as well as his alleged theft of business in the Alusaf contract.

As a threshold issue, we note that Holme, as a shareholder in Global, a closely held corporation, owed a fiduciary duty to the other Global shareholders. (*Fender v Prescott*, 101 AD2d 418 [1st Dept 1984], *affd* 64 NY2d 1077, 1079 [1985].) Additionally, Holme owed a fiduciary duty to Global arising out of his status as a corporate officer and director. (*See Alpert v 28 Williams St. Corp.*, 63 NY2d 557, 568 [1984].) This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (*Birnbaum v Birnbaum*, 73 NY2d 461, 466 [1989].) Moreover, these fiduciary duties were not extinguished by Holme's acrimonious relationship with Global until he withdrew from the corporation. (*See Blue Chip Emerald v Allied Partners*, 299 AD2d 278, 279 [1st Dept 2002].)

Thus, Holme, in negotiating his severance, was obliged "to disclose any information that could reasonably bear on plaintiff['s] consideration of [his] offer." (*Dubbs v Stribling & Assoc.*, 96 NY2d 337, 341 [2001].) Absent such full disclosure, the transaction is voidable. (*Blue Chip Emerald*, 299 AD2d at 279-280.)

On appeal, Global asserts that the motion for summary judgment was improperly granted because questions of fact exist as to whether Holme misrepresented material facts. Global argues that questions of fact exist as to his concealment of the alleged breaches of fiduciary obligation to Global. Global claims that Holme materially misrepresented that Holme had made a personal loan to Locker; that the Wessex shares in Mrs. Holme's maiden name were only security for that loan; that WMMC was formed only to hold the proposed assignment of the Bulgarian contract from Global to Holme; that H & H was dormant until after Holme resigned from Global; and that the Alusaf contract was dead when Holme's company, H & H, picked it up.

However, while Global may be correct that questions of fact exist as to these alleged misrepresentations, nevertheless the motion for summary judgment was properly granted. We find that even assuming the defendant made such misrepresentations with intent to defraud, no triable issue exists with respect to Global's claim for fraudulent inducement since the evidence establishes that its reliance on any such alleged misrepresentations was unreasonable, and that Global failed to fulfill its duty to investigate. (*See New York City School Constr. Auth. v Koren-DiResta Constr. Co.*, 249 AD2d 205 [1st Dept 1998].)

First, we set aside the contention that issues of material misrepresentation and reasonable reliance are not subject to summary disposition. (*Cf. Brunetti v Musallam*, 11 AD3d 280 [1st Dept 2004].) In *J.A.O. Acquisition Corp. v Stavitsky* (18 AD3d 389 [1st Dept 2005]), we concluded that occasionally, the facts in the case may present a rare circumstance in which the issue of reasonable reliance can be resolved at the stage of summary judgment. Similarly, in *Shea v Hambros PLC* (244 AD2d 39, 47 [1st Dept 1998]), we held that, as a matter of law, the element of reliance was conspicuously absent because the plaintiff "can hardly claim with any credibility that he, a savvy businessman, entered into the resulting agreements lulled by faith or trust in the parties across the bargaining table, or that he unwittingly gave up some valued right in the bargain."

Global argues that this case does not present the "rare circumstances" where summary judgment is warranted, and that the motion court erroneously engaged in fact-finding and credibility determinations. It also argues that its duty to investigate was limited to the means available to it, which did not include the ability to obtain information from nonparties such as Wessex, Alusaf and GM.

We find these assertions to be without merit. New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transactions and the business they are acquiring. (*See e.g. Abrahami v UPC Constr. Co.*, 224 AD2d 231, 234 [1st Dept 1996] [sophisticated businessmen had a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they were assuming].)

Moreover, when the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. (*Banque Franco-Hellenique de Commerce Intl. et Mar., S.A. v Christophides*, 106 F3d 22, 27 [2d Cir 1997].) It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy. (*Keywell Corp. v Weinstein*, 33 F3d 159, 164 [2d Cir 1994].) When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that the facts may not be as represented. (*Rodas v Manitaras*, 159 AD2d 341, 343 [1st Dept 1990].)

In this case, the facts are abundantly clear as to why Global's reliance was unreasonable. The documentary evidence of both parties establishes that on December 12 1996, Holme's attorney told Global that Holme had loaned Wessex approximately $1.5 million. Rather than rely on this characterization, Global searched public records and learned that on February 2, 1995, Holme's wife became the owner of 40% of Wessex's shares. On January 7, 1997, Holme asked Global to assign him its interest in the Bulgarian contract to gain leverage in collecting the alleged loan. When Global's attorney responded on January 8, 1997, he expressed his skepticism by referring to the Wessex transaction as "alleged loans." He also noted that the transaction may have occurred while Holme was an officer and director of Global, from which it may be inferred that Global already had concerns that Holme had breached his fiduciary duty.

Further, while Holme's attorney maintained that the transaction was indeed a loan, the record demonstrates that Locker, through Eversheds, challenged that characterization, and indicated that Locker had documentation proving otherwise. This provided Global with more than a hint of the falsity of Holme's representation, requiring heightened diligence.

At a minimum, Global should have contacted Eversheds and Locker. Even if they refused to provide further information,

Global should have sought to condition the settlement on the truth of the representations by or on behalf of Holme that induced Global to enter the settlement. (*See Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc.,* 16 AD3d 352, 352 [1st Dept 2005] ["plaintiff . . . failed to seek the insertion of a prophylactic provision in the purchase agreement to ensure against the possibility of misrepresentation"].)

Moreover, the claim that Global believed a personal loan to Locker was not a breach of the shareholder agreement or Holme's fiduciary duty is undermined by the January 14, 1998 letter. In that letter, Global indicated its belief that Holme had breached his fiduciary duty, whether he made a personal loan to Locker or he invested in Wessex, because in either case, he had a stake in the financial success of Global's competitor.

With respect to the stolen Alusaf contract, Global argues that Holme's concealment of his business made it impossible for Global to have notice of it. Global also argues that the letter agreement between Holme and Campbell, which allowed Holme to discuss his new business, did not authorize self-dealing and stealing Global's business while he was still affiliated with Global. Global concludes that there was no reason to question Holme's representations that H & H was dormant and that there is no reason to believe that Alusaf or GM would have made any disclosure to Global if they had been asked.

These claims are also unavailing. Even assuming that Holme told Campbell that the Alusaf contract was dead, documentary evidence shows that Global knew, or should have known, that it was not. However, Global failed to exercise due diligence because it made no independent inquiry to check on the status of the contract, even though it was in direct contact with both Alusaf and GM.

Finally, Global's contentions that Mrs. Holme aided her husband's breaches of fiduciary duties and that H & H was Holme's alter ego are without merit. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead a breach of fiduciary duty, that defendant knowingly induced or participated in the breach, and damage resulting from the breach. (*Kaufman v Cohen,* 307 AD2d 113, 125 [1st Dept 2003].) "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." (*Id.* at 126.) Actual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not merely rely on conclusory and sparse allegations that the

aider or abettor knew or should have known about the primary breach of fiduciary duty. (*See Prudential-Bache Sec. v Citibank*, 73 NY2d 263 [1989]; *Brasseur v Speranza*, 21 AD3d 297 [1st Dept 2005].) Furthermore, "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." (*Kaufman v Cohen*, 307 AD2d at 126.)

Here, Mrs. Holme owed no fiduciary duty to Global. Nor is there any evidence that she was aware of the terms of the shareholder agreement. Locker stated in his statement that his dealings concerning Wessex were with Holme, not Mrs. Holme. The only alleged direct action of Mrs. Holme is the request for a dividend. In this regard, the record shows that on June 10, 1996, Wessex faxed a form letter with blanks to be filled in as to where the dividend was to be deposited. On June 11, 1996, the form was retyped, with the blanks filled in, and signed by Mrs. Holme. This occurred after Holme was no longer a shareholder or director and there is no proof of substantial assistance by Mrs. Holme. The fact that Mrs. Holme knew that Holme was a shareholder and officer of Global does not show that she knew his dealings with Wessex violated any agreements or his fiduciary duties, and Global shows only that she knew the stock was placed in her name.

As to H & H, it was formed by Holme on October 18, 1995. This was not done in secret. The October 17, 1995 letter agreement shows that Global knew of Holme's intent to start a new business, that he would be having "discussions" concerning it and that this would not violate his fiduciary duty.

Finally, Global argues that the motion court erred when it rejected its CPLR 3212 (f) request on the ground that "plaintiff fails to identify an essential fact which is presently unavailable to Global." Global states that it made several unsuccessful attempts to depose Holme and Mrs. Holme, that the court previously denied defendants' motion to stay discovery pending the summary judgment motion, and that the court initially took the position on the subject motion that discovery was needed. Further, Global maintains that the discovery it sought from Holme, Mrs. Holme, and nonparties Mohen, Alusaf and Harrison, was needed to test the court's assumption that Global could have discovered Holme's breaches had it fulfilled its duty to investigate.

CPLR 3212 (f) permits a party opposing summary judgment to obtain further discovery when it appears that facts support-

ing the position of that party exist but cannot be stated. (*Baldasano v Bank of N.Y.*, 199 AD2d 184, 185 [1st Dept 1993], citing *Terranova v Emil*, 20 NY2d 493, 497 [1967].) Under CPLR 3212 (f), where facts essential to justify opposition to a motion for summary judgment are exclusively within the knowledge and control of the movant, summary judgment may be denied. This is especially so where the opposing party has not had a reasonable opportunity for disclosure prior to the making of the motion. (*Overseas Reliance Tours & Travel Serv. v Sarne Co.*, 17 AD2d 578, 580 [1st Dept 1963]; *see also Baron v Incorporated Vil. of Freeport*, 143 AD2d 792 [2d Dept 1988].)

The party invoking the section must provide a proper evidentiary basis supporting its request for further discovery. (*See Ruttura & Sons Constr. Co. v Petrocelli Constr.*, 257 AD2d 614, 615 [2d Dept 1999], *lv dismissed in part and denied in part* 93 NY2d 956 [1999]; *Jones v New York City Tr. Auth.*, 166 AD2d 293 [1st Dept 1990].)

Here, Global failed to identify any fact available to it that would justify its opposition to the motion. While it claims it needed Locker's deposition and documents from Wessex, Global itself submitted a statement from Locker supporting its position in opposition to the motion. As to the Alusaf contract, Global asserted that it had documentary evidence regarding Holme's conduct, but needed deposition testimony to confirm the reading of those documents. However, what Global has failed to do is to show any additional specific facts that would be discovered to show that its reliance was reasonable. Therefore, the plaintiff's request was properly denied.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered January 26, 2006, which granted defendants' motion for summary judgment dismissing the complaint, should be affirmed, without costs.

FRIEDMAN, J.P., NARDELLI and GONZALEZ, JJ., concur.

Order, Supreme Court, New York County, entered January 26, 2006, affirmed, without costs.