OPINION OF THE COURT
Friedman, J.
The fifth cause of action pleaded in the verified second amended complaint seeks to recover for an alleged fraud relating to the purchase of the building at 552-562 Academy Street in Manhattan by an entity in which plaintiffs Rachel L. Arfa and Alexander Shpigel (collectively, Arfa/Shpigel) held a 60% interest and defendant Gadi Zamir held a 40% interest. Zamir arranged the purchase of the Academy Street building, which closed in April 2005, and Arfa/Shpigel allege that they, as holders of the majority interest, assented to the transaction based on several misrepresentations by Zamir, including (1) his understatement of the cost of the renovations the building needed, (2) his failure to disclose structural and foundational defects reflected in engineering reports, and (3) his failure to disclose building code violations for which he had given the mortgagee an undertaking. It is undisputed, however, that the cause of action based on these allegations falls squarely within the scope of the general release contained in the parties’ subsequent “Agreement—Governance of Entities,” dated June 9, 2005 (the Governance Agreement), which release covers “any and all” claims, whether “known or unknown,” arising from prior events.[1] Assuming (as we must on a motion to dismiss) the *58 truth of Arfa/Shpigel’s allegations, the Governance Agreement’s general release bars the fifth cause of action as a matter of law. We therefore reverse and grant the motion to dismiss that claim pursuant to CPLR 3211 (a) (5).
“Each of the Principals [Arfa, Shpigel and Zamir], on behalf of themselves, the Controlled Entities and their Related Parties, hereby releases each of the other Principals and their Related Parties from any and all claims, demands, actions, rights, suits, liabilities, interests and causes of action, known and unknown, which they have ever had, have or may now have, which in any way pertain to or arise from any matters, facts, occurrences, actions or omissions which occurred prior to or as of the date hereof.”
Arfa/Shpigel argue that, based on their allegations, the general release in the Governance Agreement was fraudulently induced and, therefore, ineffective. It is Arfa/Shpigel’s theory that, during the negotiations leading to the execution of the Governance Agreement in June 2005, Zamir was obligated to correct his prior alleged misrepresentations concerning the condition of the Academy Street building. This theory is not pleaded in the complaint, which does not allege that Arfa/ Shpigel entered into the Governance Agreement based on any misrepresentations concerning the Academy Street building. Nonetheless, even assuming that Zamir was obligated to correct any prior misrepresentations during the negotiation of the Governance Agreement, that agreement (as Arfa/Shpigel themselves allege) was the result of rigorous, arm’s length negotiations between highly sophisticated parties.[2] According to the complaint, by the time the parties began negotiating the Governance Agreement, they had already developed an adversarial, even hostile, relationship.[3] In this context, notwithstanding the fiduciary obligation owed by each side to the other with *59 respect to the management of the underlying real estate business, Arfa/Shpigel, as sophisticated businesspeople, had “an affirmative duty ... to protect themselves from misrepresentations ... by investigating the details of the transactions and the business” affected by the Governance Agreement (Global Mins. & Metals Corp. v Holme, 35 AD3d 93,100 [2006], lv denied 8 NY3d 804 [2007]). In Global, for example, this Court granted summary judgment dismissing a fraud claim because the plaintiff unreasonably relied on alleged misrepresentations without fulfilling its duty to investigate (id. at 99), notwithstanding that the defendant owed a fiduciary duty to the plaintiff (id. at 98).
Given the sweeping scope of the Governance Agreement’s general release, Arfa/Shpigel were obligated, before signing, to investigate all prior transactions for which they had not previously conducted due diligence that might give rise to a claim against Zamir. Had such due diligence been performed, the matters concerning the Academy Street building Zamir allegedly had misrepresented—all of which concerned the physical condition of the building as reflected in engineering reports and noticed violations—presumably would have been revealed. Arfa/ Shpigel, however, do not allege that they conducted any such due diligence, nor do they allege that Zamir prevented them from doing so. Indeed, Arfa/Shpigel do not even allege that they asked Zamir to provide them with the engineering reports on the Academy Street building at any time before entering into the Governance Agreement.
Arfa/Shpigel cannot avoid the release set forth in the Governance Agreement unless they establish that their reliance on Zamir’s alleged misrepresentations was reasonable, and such reasonable reliance “is a condition which cannot be met where, as here, ‘a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means’ ” (New York City School Constr. Auth. v Koren-DiResta Constr. Co., 249 AD2d 205, 205-206 [1998], quoting Stuart Silver Assoc, v Baco Dev. Corp., 245 AD2d 96, 98-99 [1997]). Arfa/Shpigel do not allege that they made any use of the means available to them to ascertain the truth of the alleged misrepresentations at issue before they entered into the Governance Agreement. Accordingly, as a matter of law, assuming the truth of the facts alleged in the complaint, Arfa/Shpigel *60 cannot avoid the effect of the general release they granted Zamir by executing the Governance Agreement.
To reiterate, Arfa/Shpigel’s allegations demonstrate that the release in the Governance Agreement was the result of rigorous, arm’s length negotiations between highly sophisticated parties who were already in a highly adversarial position. Specifically, as alleged in the complaint, Zamir essentially extorted Arfa/Shpigel to enter into the Governance Agreement by threatening to cease performing maintenance work on the properties unless Arfa/Shpigel agreed to increase Zamir’s vote to 50%, notwithstanding his lesser ownership interest. To this end, Zamir allegedly went so far as to engage in work stoppages and slowdowns. Faced with Zamir’s threat to pull the maintenance staff out of the properties, Arfa/Shpigel relented and agreed to sign the Governance Agreement, even though they could have fired him, in order to avoid a “bitter internecine battle.” Thus, the release in the Governance Agreement related directly to the parties’ conflicts over the management and maintenance of the properties.
Given the parties’ adversarial relationship, and Arfa/Shpigel’s contention that Zamir extracted the Governance Agreement from them by duress, Arfa/Shpigel—each a highly sophisticated businessperson—had, by their own account, clear notice of Zamir’s alleged dishonesty. Given Arfa/Shpigel’s receipt of “hints” that Zamir was not trustworthy, a “heightened degree of diligence [was] required of [them],” and they “[could not] reasonably rely on [Zamir’s] representations without making additional inquiry to determine their accuracy” (Global Mins., 35 AD3d at 100). “When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that the facts may not be as represented” (id., citing Rodas v Mandaras, 159 AD2d 341, 343 [1990]; see also Graham Packaging Co., L.P. v Owens-Illinois, Inc., 67 AD3d 465 [2009]; Permasteelisa, S.p.A. v Lincolnshire Mgt, Inc., 16 AD3d 352 [2005]). The “adversarial” nature of the parties’ relationship “negat[es] as a matter of law any inference that business [people] as sophisticated as [Arfa/Shpigel] were relying on [Zamir] for an objective assessment of the value of their investment” (Centro Empresarial Compresa S.A v América Móvil, SAB. de C.V, 76 AD3d 310, 320-321 [2010], citing Shea v Hombros PLC, 244 AD2d 39, 47 [1998]). Moreover, the implication of Arfa/ Shpigel’s position is that “a fiduciary can never obtain a valid *61 release without first making a full confession of its sins to the releasor,” a proposition that has never been the law (Centro Empresarial, 76 AD3d at 319).
Arfa/Shpigel’s reliance on Littman v Magee (54 AD3d 14 [2008]) is misplaced. In Littman, a general release in the agreement for the sale of the plaintiffs interest in a closely-held business was held not to bar a fraud action against a former fiduciary at the pleading stage because the complaint was deemed to allege that the defendant fiduciary had told the plaintiff that no further documentation bearing on the valuation of the enterprise existed. While Littman reaffirmed that even a fraud claim against a fiduciary must establish justifiable reliance on the alleged misstatement, the case held that the alleged misrepresentation concerning the availability of information relevant to the transaction raised an issue as to whether plaintiff justifiably relied on the defendant’s statements without making further investigative efforts (54 AD3d at 19). Here, by contrast, Arfa/Shpigel do not allege that Zamir did or said anything to impede their ability to investigate the truth and completeness of his representations concerning the Academy Street building. On the contrary, assuming the truth of the complaint, Arfa/ Shpigel never asked Zamir for even a page of documentation of the condition of the building.
Also inapposite is Blue Chip Emerald v Allied Partners (299 AD2d 278 [2002]), in which the managing member of a joint venture was sued for purchasing the interest of the other member based on the manager’s misrepresentation or concealment of the true price range in which it was negotiating to sell the venture’s underlying asset. In holding that the defense was not entitled to the dismissal of the Blue Chip complaint notwithstanding certain representations and disclaimers in the agreement governing the purchase and sale of the interest of the plaintiff (BCE), we emphasized, based on the allegations of the complaint, that
“it cannot be said as a matter of law that BCE had at its disposal ready and efficient means for obtaining or verifying the relevant information on its own. For example, there is no reason to believe that BCE could have learned the substance of the [manager’s] discussions with potential purchasers from public sources or from some easily located private source, such as the Venture’s financial records. Indeed, such offers might well not have been documented at all *62 . . . , or might have been reflected only in letters, e-mail, or notes that could be discovered only through a full-blown, litigation-style review of the [manager’s] files. Moreover, in view of the competitive nature of business and the natural presumption that BCE should look to its own partner for information about the Venture, it cannot be assumed . . . that BCE had only to make phone calls to the potential purchasers identified in the buy-out agreement to learn what they were offering for the [underlying asset]” (id. at 280-281 [citations omitted]).
The facts of Blue Chip are readily distinguished from those alleged here. In Blue Chip, when the parties closed their deal— which entailed only contractual disclaimers of reliance, not (as here) a formal general release—their relationship had not deteriorated to the level of distrust that existed between Arfa/ Shpigel and Zamir when the Governance Agreement was executed. Thus, the plaintiff in Blue Chip sold its interest without having received the “hints of . . . falsity” (Global Mins., 35 AD3d at 100) that should have placed Arfa/Shpigel on guard here. In addition, Arfa/Shpigel claim to have been deceived as to the physical condition of the Academy Street building—a matter readily subject to verification through due diligence, as is evident from the complaint itself—and there is no allegation that, notwithstanding their high level of sophistication and extensive experience in the real estate business and law, they made any effort to verify Zamir’s alleged misrepresentations concerning the building’s condition. Again, Arfa/Shpigel do not even allege that they requested an opportunity to review the reports on the building in Zamir’s possession. Further, building code violations are matters of public record that can be readily ascertained by an interested party.
Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered December 15, 2008, which, to the extent appealed from as limited by the brief, denied the motion by defendants Gadi Zamir and Zamir Properties, Inc. to dismiss the fifth cause of action of the verified second amended complaint, should be reversed, on the law, with costs, and the motion granted.
Mazzarelli, J.E, Andrias, Nardelli and Moskowitz, JJ., concur.
*63 Order, Supreme Court, New York County, entered December 15, 2008, reversed, on the law, with costs, and the motion granted.

. The Governance Agreement reallocated managerial authority over the parties’ jointly held real estate interests. Specifically, although ownership was split between the parties 60% to Arfa/Shpigel and 40% to Zamir, the Governance Agreement provided, inter alia, that managerial authority would be divided between each side on a 50-50 basis. In addition, section 6 of the Governance Agreement, entitled “General Release,” provides as follows:

. In their complaint, Arfa/Shpigel allege the facts establishing their sophistication. Arfa, an attorney, has practiced law with the Securities and Exchange Commission and as a partner in a large corporate law firm for more than 12 years. Shpigel, a 20-year veteran of the real estate business, is a principal in his own real estate brokerage firm and has served as a consultant on investing in the U.S. real estate market to Israel’s largest pension fund and to prominent Israeli individuals.

. The complaint alleges that the negotiations leading to the Governance Agreement grew out of Zamir’s dissatisfaction with his minority position in the enterprise, in which he was initially relegated to overseeing maintenance of the buddings. Out of his "unhappiness, Zamir allegedly made various threats to disrupt the operation of the buildings and engaged in work stoppages and slowdowns. The complaint alleges that it was “[t]o appease Zamir and prevent him from destroying the value of the real estate portfolio” that Arfa/Shpigel negotiated and executed the Governance Agreement with Zamir, which, as *59 previously noted, increased the latter’s managerial authority within the enterprise from 33% to 50%.