(January 12, 2017)

■ KUMIVA GROUP, LLC, Formerly Known as ATI SERVICES, LLC, Plaintiff/Counterclaim Defendant-Respondent, v GARDA USA INC., Defendant/Counterclaim Plaintiff-Appellant. GARDA USA INC. et al., Counterclaim Plaintiffs-Appellants, v RICHARD IRVIN et al., Counterclaim Defendants-Respondents. [45 NYS3d 410]—

Order, Supreme Court, New York County (Saliann Scarpulla, J.), entered August 5, 2015, which, insofar as appealed from as limited by the briefs, granted plaintiff/counterclaim defendant Kumiva Group, LLC (Kumiva) and counterclaim defendants Richard Irvin and Robert Irvin's (Irvin defendants) motion for summary judgment dismissing defendant/counterclaim plaintiff Garda USA Inc. (Garda) and counterclaim plaintiff ATI Systems International, Inc.'s (ATI) counterclaim for fraud, and awarded Kumiva prejudgment interest, at the statutory rate, upon $6,250,000 of Garda's liability, unanimously affirmed, with costs.

Garda is an American subsidiary of Garda World Security Corp., a Canadian corporation that is one of the largest security

and cash handling businesses in the world. Garda sought to expand its operations into the United States, and in 2006 approached the Irvin defendants, who controlled ATI, a private security and armored car company with large operations in the United States, about a potential acquisition. Concurrent to ATI's negotiations with Garda, on November 30, 2006, ATI acquired CDC Systems Inc. (CDC), a smaller security and armored car company with a strong presence in the New York City market, for $25,000,000. ATI believed it could achieve significant synergies and cost savings by merging CDC's New Jersey operations with ATI's existing New Jersey operations.

On December 8, 2006, ATI counter-signed a nonbinding letter of intent from Garda, under which ATI agreed that Garda would conduct due diligence before purchasing ATI, and proposed that Garda would value ATI at 8.5 times ATI's 2006 pro forma Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA). The letter of intent assumed a minimum 2006 pro forma EBITDA of $37,000,000, which would lead to a purchase price of $314,000,000, and established a maximum purchase price of $398,500,000 if ATI's 2006 pro-forma EBITDA exceeded $45,000,000. Subsequently, Garda retained PricewaterhouseCoopers (PWC) to conduct due diligence along with Garda's chief financial officer and investment bankers. Upon the conclusion of Garda's due diligence, on February 25, 2007, Garda and ATI entered into an Agreement and Plan of Merger (the merger agreement) under which Garda agreed to acquire ATI for a purchase price of $341,700,000.

From December 8, 2006, when ATI countersigned Garda's letter of intent, through February 25, 2007, when Garda and ATI entered into the merger agreement, the events forming the basis for the instant action occurred. During this period, Garda and ATI engaged in extensive negotiations, including numerous phone conferences, email exchanges, and meetings, to determine ATI's 2006 pro-forma EBITDA and the purchase price for ATI. A major point of contention was the effect that the anticipated positive synergies and savings from ATI's acquisition of CDC would have on ATI's 2007 pro forma EBITDA.

Garda avers that approximately one third of ATI's $341,700,000 purchase price was based on ATI's representation to Garda of the value and positive synergies that ATI would realize through the integration of CDC into ATI's operations. Garda accuses ATI of fraudulently inducing Garda to raise its offer by misrepresenting to Garda that ATI was achieving

significant savings by integrating CDC into its own operations, while minimizing the difficulties ATI was experiencing integrating CDC. Garda asserts that if it had known the extent of the difficulties ATI experienced integrating CDC, and the number of customers ATI lost due to these difficulties, Garda would have lowered its offer by an amount in the range from $36,000,000 to $81,000,000.

ATI acknowledges that it experienced significant issues integrating CDC, including a number of account cancellations due to unsatisfactory service. In fact, ATI insisted on including a disclosure in the merger agreement disclosing that ATI's integration of CDC involved "several start-up issues including deposits being misrouted, lost or delayed, which caused some financial losses and some potential lost business." Based on this disclosure and the due diligence Garda was allowed to conduct, Kumiva and the Irvin defendants assert that Garda had sufficient notice during the due diligence period of ATI's difficulties integrating CDC and, notwithstanding such notice, agreed to the $341,700,000 purchase price.

As relevant to this appeal, Kumiva and the Irvin defendants moved for summary judgment dismissing Garda's counterclaim for fraudulent inducement on the grounds that Garda failed to show "out of pocket" damages and justifiable reliance on ATI's representations. Supreme Court granted Kumiva and the Irvin defendants summary judgment dismissing the fraudulent inducement counterclaims, holding that, as a matter of law, Garda failed to show nonspeculative damages and, further, that ATI's disclosures precluded Garda from showing justifiable reliance. Upon Garda's appeal, we affirm.

Initially, as to Garda's damages, New York courts for over 100 years have differentiated between the damages recoverable for a breach of contract action and those recoverable for fraudulent inducement. While a plaintiff alleging breach of contract is entitled to damages restoring the full benefit of the bargain, a plaintiff alleging fraudulent inducement is limited to "out of pocket" damages, which consist solely of the actual pecuniary loss directly caused by the fraudulent inducement. "Out of pocket" damages are calculated in three steps. First, the plaintiff must show the actual value of the consideration it received. Second, the plaintiff must prove that the defendant's fraudulent inducement directly caused the plaintiff to agree to deliver consideration that was greater than the value of the received consideration. Finally, the difference between the value of the received consideration and the delivered consideration constitutes "out of pocket" damages (*see Lama Holding*

*Co. v Smith Barney*, 88 NY2d 413, 421-422 [1996]; *Sager v Friedman*, 270 NY 472, 481 [1936]; *Reno v Bull*, 226 NY 546, 552-553 [1919]; *Connaughton v Chipotle Mexican Grill, Inc.*, 135 AD3d 535, 538-539 [1st Dept 2016]).

Here, to show nonspeculative damages, Garda was required to submit evidence establishing ATI's actual value on February 25, 2007, the date of the execution of the merger agreement setting the purchase price for the company. Next, Garda had the burden to submit evidence that ATI's misrepresentations directly caused Garda to agree to pay consideration to ATI that was greater than ATI's actual value. The difference between these two sums would then constitute Garda's out-of-pocket damages. Garda failed to come forward with such evidence.

In opposition to Kumiva's and the Irvin defendants' motion for summary judgment, Garda submitted, inter alia, the expert affidavit of J.T. Atkins, the head of an advisory firm specializing in mergers and acquisitions. Atkins explained that the conventional manner to appraise a business requires conducting three studies: (1) a comparable company analysis; (2) a precedent transaction analysis; and (3) a discounted cash flow analysis. The results of these three studies are then triangulated to determine the value of the business.

Garda concedes that it failed to conduct a formal valuation of ATI's value on February 25, 2007. Rather, Garda's experts attempted to calculate the first step of the "out of pocket" damages analysis by assuming that the $341,700,000 purchase price constituted ATI's actual value. Atkins acknowledged that using the $341,700,000 purchase price as a valuation of ATI was "not a formal valuation by any stretch of the imagination." Nevertheless, Garda posits that since ATI and Garda negotiated the $341,700,000 price through arms length negotiations, that price constitutes the "best measure" of ATI's value on February 25, 2007. Garda further contends that a formal appraisal method may have distorted Garda's damages by including damages "solely due to changes in methodology."

Contrary to Garda's arguments, the negotiated price cannot substitute for evidence of ATI's actual value on the relevant date for purposes of a damages calculation. As Garda itself concedes, a formal appraisal of ATI's value may have established that ATI was actually worth either more than or less than $341,700,000. If ATI's value were equal to or greater than $341,700,000 (which cannot be determined on this record), Garda would not be entitled to damages for fraudulent inducement (*see Lama Holding*, 88 NY2d at 422 ["There were, however, no losses here because plaintiffs . . . received more

than twice the fair market value for their shares"]; *Reno*, 226 NY at 553 ["The plaintiff paid $5,000 for the stock purchased by him. If he were entitled to recover at all, it was the difference between that amount and the value of the stock which he received . . . He was not entitled to anything else"]).

Garda also failed to complete properly the second step of the "out of pocket" damages calculation. Instead of showing that Garda delivered consideration greater than ATI's actual value, Garda asked its experts to calculate the dollar amount by which ATI's misrepresentations "inflated" the purchase price. Atkins opined that the misrepresentations inflated ATI's price by $81,000,000. Garda also submitted the affidavit of another expert, Simon Platt, a forensic accountant, who opined that the misrepresentations inflated the price by $36,000,000. Based on these opinions, Garda concluded that it suffered out-of-pocket damages in an amount between $36,000,000 and $81,000,000. However, a showing that Garda would have made a lower offer if ATI had not made any misrepresentations does not suffice to demonstrate that Garda suffered any actual pecuniary loss. In fact, Garda essentially concedes that an actual formal valuation might well have shown that ATI was worth more than $341,700,000 on the valuation, in which case Garda would not have suffered any pecuniary damages at all.

In sum, Garda failed to properly calculate "out of pocket" damages. First, apparently out of a misguided concern that a formal appraisal might show that it had paid a fair price for ATI, Garda conflated the first and second steps by concluding that the agreed-upon purchase constituted ATI's actual value, instead of conducting a formal appraisal to determine that actual value. Second, instead of comparing the delivered consideration to ATI's actual value, Garda attempted to work backwards from the agreed-upon price and to estimate how much lower Garda's offer would have been but for ATI's misrepresentations. These exercises cannot substitute for admissible evidence of ATI's actual value on the relevant date.

Turning next to the issue of justifiable reliance, while the merger agreement's disclaimers are not sufficiently specific to preclude justifiable reliance on the alleged misrepresentations, which concern facts peculiarly within the seller's knowledge (*see Basis Yield Alpha Fund [Master] v Goldman Sachs Group, Inc.*, 115 AD3d 128, 137 [1st Dept 2014]), such reliance was not reasonable where ATI informed Garda that "there were several start-up issues [with the integration of a recently acquired company] . . . which caused some financial losses and . . . potential lost business" (as stated in schedule 3.7 [13] to the

merger agreement), Garda received several indications that the integration was not going as smoothly as anticipated or reported, and its due diligence firm, PWC, warned that "it is too early to assess the effectiveness of the integration plan" (*see Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 17 NY3d 269, 279 [2011]; *Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 100 [2006], *lv denied* 8 NY3d 804 [2007]).

Finally, Supreme Court properly awarded prejudgment interest, at the statutory rate, on the monies which had been held in escrow (CPLR 5001, 5004). Neither the merger agreement nor the related escrow agreement specified an interest rate to be paid in the event of default (*see NML Capital v Republic of Argentina*, 17 NY3d 250, 258 [2011]; *Secular v Royal Athletic Surfacing Co.*, 66 AD2d 761 [1st Dept 1978], *appeal dismissed* 46 NY2d 1075 [1979]).

We have considered appellants' remaining arguments and find them unavailing. Concur—Friedman, J.P., Saxe, Moskowitz, Gische and Kahn, JJ.